UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CAROLYN MORGAN, AS THE
PERSONAL REPRESENTATIVE OF
DANNY POLSTON,

        Plaintiff,

v.                              Case No. 3:13-cv-81-J-34PDB

KENNETH S. TUCKER, et al.,

        Defendants.

_____

**<u>ORDER</u>**

**I. Status**

Plaintiff Carolyn Morgan (Morgan), the mother of Danny Polston (Polston) and personal representative of Polston's estate, sues eight Defendants in the Fourth Amended Complaint (FAC; Doc. 106), filed June 1, 2015: (1) Kenneth S. Tucker, a former Secretary of the Florida Department of Corrections (FDOC); (2) Julie J. Jones, Secretary of the FDOC; (3) Brian Riedl, Warden of the Reception and Medical Center (RMC); (4) Steven Wellhausen, Warden of Columbia Correctional Institution (CCI); (5) Don Davis, Warden of CCI; (6) Paul A. Kish, Warden of CCI; (7) Dr. J. Morales, M.D., Chief Health Officer at CCI; and (8) Dr. D. Gaxiola, M.D., a former Chief Health Officer at CCI.[1] <u>See</u> FAC at 1, 3-4. Morgan sues Secretary Jones in

_____

[1] The Court granted Defendant Corizon's Motion to Dismiss, and dismissed Morgan's 42 U.S.C. § 1983 claim against Corizon. <u>See</u> Order (Doc. 136), filed March 21, 2016.

her official capacity and the remaining Defendants in their individual capacities. See id. at 3-4.

This matter is before the Court on Defendants Jones, Tucker, Riedl, Wellhausen, Davis, Kish and Morales' Motion to Dismiss Fourth Amended Complaint (Motion to Dismiss; Doc. 131) and Defendant Gaxiola's Motion to Dismiss Fourth Amended Complaint (Gaxiola Motion; Doc. 148). Plaintiff filed her responses in opposition to the motions. See Plaintiff's Response to Defendants Jones, Tucker, Riedl, Wellhausen, Davis, Kish and Morales' Motion to Dismiss (Response I; Doc. 133); Plaintiff's Response to Defendant Gaxiola Motion to Dismiss (Response II; Doc. 150). The motions are ripe for review.

## II. Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Omar ex. rel. Cannon v. Lindsey, 334 F.3d 1246, 1247 (11th Cir. 2003) (per curiam). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary[,]" the complaint should

"'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556); see Miljkovic v. Shafritz & Dinkin, P.A., 791 F.3d 1291, 1297 (11th Cir. 2015) (citation and footnote omitted). A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." See Iqbal, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face[.]'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

The Eleventh Circuit recently stated:

> To survive a motion to dismiss, [plaintiff]'s complaint must have set out facts sufficient to "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). This means he must have alleged "factual content that allow[ed] the court to draw the reasonable inference that the defendant[s] [were] liable for the misconduct." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The allegations must be plausible, but plausibility is not probability. See id.

Lane v. Philbin, No. 14-11140, 2016 WL 4487983, at *1 (11th Cir. Aug. 26, 2016).

## III. Fourth Amended Complaint[2]

According to the FAC, while in FDOC custody, Polston was confined to a wheelchair, was a disabled and qualified individual as defined in the Americans with Disabilities Act (ADA) (42 U.S.C. § 12131 et seq.) and the Rehabilitation Act, who required assistive

---

[2] The FAC is the operative pleading. In considering the motions to dismiss, the Court must accept all factual allegations in the FAC as true, consider the allegations in the light most favorable to the plaintiff, and accept all reasonable inferences that can be drawn from such allegations. Miljkovic v. Shafritz and Dinkin, P.A., 791 F.3d 1291, 1297 (11th Cir. 2015) (quotations and citations omitted). As such, the recited facts are drawn from the FAC and may differ from those that ultimately can be proved. Additionally, because this matter is before the Court on motions filed by the remaining Defendants, the Court's recitation of the facts will focus on Morgan's allegations as to them, not Corizon.

devices in order to perform daily activities. FAC at 2, ¶ 5; 5, ¶ 17. Morgan asserts that Secretary Jones violated Polston's rights under the ADA, Count I, id. at 15-17, and the other Defendants violated his federal constitutional rights under 42 U.S.C. § 1983: Tucker, Count II, id. at 17-19; Riedl, Count III, id. at 19-22; Wellhausen, Count IV, id. at 22-25; Davis, Count V, id. at 25-28; Kish, Count VI, id. at 28-31; Dr. Morales, Count VII, id. at 31-33; Dr. Gaxiola, Count VIII,[3] id. at 33-34; and Secretary Jones, Count X, id. at 37-38.[4] Morgan states that Polston's medical challenges at issue in the instant action began on December 4, 2009, when he fell from his wheelchair and fractured his hip. Id. at 7, ¶ 24. While incarcerated, Polston has suffered from various medical conditions and impairments, including: hip replacement, necrosis, and osteomyelitis; chronic hip infection since 2009; spinal disc disease; coronary heart disease and high blood pressure; Hepatitis C; and chronic renal insufficiency. Id. at 5, ¶¶ 15, 17.

According to Morgan, after the December 4, 2009 fall, Polston immediately reported to the medical department where a nurse, not a physician, admitted him to the infirmary without any evaluation. Id. at 7, ¶ 24. Morgan maintains that medical personnel did not

---

[3] Morgan labeled the count as "Count XIII," see FAC at 33; however, the Court will use the proper sequence and refer to the count as "Count VIII."

[4] As previously noted, the Court dismissed Morgan's § 1983 claim against Corizon. See Order (Doc. 136), filed March 21, 2016; FAC at 34-36, Count IX.

diagnose Polston's hip fracture until December 8th, four days after his fall. Id. She avers that, on December 11th, Polston "underwent surgical repair for his hip fracture," and the physician ordered daily dressing changes, urgent physical therapy and a post-operative follow-up with the orthopedic surgeon in one week. Id. at ¶ 25. Morgan insists that FDOC physicians failed to: follow post-operative orders relating to Polston's renal failure and hip fracture, and perform a post-operative follow-up within one week, as recommended; instead, an orthopedic surgeon saw Polston two weeks later. Id.

Morgan states that Polston was not scheduled for physical therapy until December 29th, three weeks after the procedure, id. at 8, ¶ 26, despite a physician's directive for urgent physical therapy, id. at 7, ¶ 25. According to Morgan, "[t]his appointment did not take place." Id. at 8, ¶ 26. Morgan asserts that, when Polston requested physical therapy on April 10, 2010, the FDOC told him to write a sick-call request and address the issue with the doctor. Id. at 9, ¶ 33. Morgan states that Polston had his first physical therapy session on April 29, 2010, four and one-half months after the specialist's December 14th directive. Id. at ¶ 37. Morgan avers that, after Polston's December 11, 2009 surgery, physicians recommended and/or ordered physical therapy on or about April 12, 2010; April 29, 2010; September 9, 2010; May 5, 2011; September 14, 2011; and May 9, 2013. Id. at 11, ¶ 48.

Morgan asserts that when Polston complained about drainage from the wound on January 8, 2010, a physician ordered antibiotics. Id. at 8, ¶ 27. She states that there was no follow-up consultation or examination to confirm that the antibiotics were provided, and Polston's orthopedic surgeon was not contacted about "possible infection." Id. According to Morgan, despite the fact the FDOC's records showed neither that the surgeon had ordered daily dressing changes nor issued a medical pass for daily dressing changes, a notation reflected that Polston had failed to report for daily dressing changes. Id. at ¶ 28. Morgan avers that the January 20, 2010 results of a culture of the wound site revealed methicillin resistant staphylococcus aureus (MRSA). Id. at ¶ 29. She states that a physician did not review the results until February 2, 2010, "again demonstrating yet another delay in care." Id.

According to Morgan, Polston suffered from hypertension and required medication to control his blood pressure. Id. at 7, ¶ 23. She states that the FDOC recorded Polston's high blood pressure (149/105) on February 11th, but failed to take any action. Id. at 8, ¶ 30. Morgan asserts that when Polston had elevated readings (172/105, 174/100) on February 15 and March 25, 2010, the FDOC ordered a single dose of medication with no follow-up orders. Id. at ¶ 31; 9, ¶ 32.

Morgan avers that an April 12, 2010 x-ray of Polston's hip showed a "lack of healing" Id. at 9, ¶ 35. According to Morgan,

there was no follow-up examination or consultation or "documentation of review of this test or notification to the surgeon." Id. Morgan states that Polston continued to complain about pain until June 28, 2010, when the FDOC determined that the first surgery had "failed" and recommended a new operation to correct the hip fracture; the second surgery was performed on July 22, 2010, and Dr. Nields at RMC ordered daily dressing changes on July 26th. Id. at ¶¶ 37, 38.

According to Morgan, on July 25, 2010, just three days after Polston's surgery, the FDOC placed Polston in a cell with no bed, no handrails, and no wheelchair; he had to sleep on a pallet on a cell floor and share space with an inmate who had a rash, despite the fact that Polston was at a high risk for infection. Id. at ¶ 39. Morgan asserts that the medical personnel documented that Polston had pus and a rash around the hip's wound site on August 3, 2010. Id. at 10, ¶ 42. Morgan states that the FDOC stabilized Polston's renal failure after he complained of vomiting, and determined that Polston needed another surgery for the hip infection. Id. According to Morgan, the FDOC neither provided cell conditions conducive to healing nor any follow-up medical care for the hip infection or renal condition. Also, she contends there is a recommendation from an infectious disease doctor to continue antibiotics for three months, but no record that Polston ever received the antibiotics. Id. at ¶¶ 42, 45. Morgan declares that

- 8 -

when Polston informed the FDOC Secretary on September 10, 2010, about the problems he had encountered at RMC when he was placed on a pallet on the floor after his surgery, the FDOC advised him that he had been placed in confinement for being unable to pass urine. Id. at 11, ¶ 49.

Morgan states that Dr. Kleinhans, M.D., an orthopedic specialist, saw Polston on August 23, 2010, and recommended that Polston see him again in two weeks, id. at 10, ¶ 46, and Dr. Tasca, M.D., an infectious disease physician, noted MRSA in Polston's left hip on August 26th, id. at 11, ¶ 47. According to Morgan, Polston submitted a request on September 16th for a consultation with Dr. Kleinhans; Dr. Kleinhans examined Polston on October 18, 2010, and recommended the "urgent" removal of all hardware in his hip, id. at ¶ 50; Polston submitted a request on November 15th to see Dr. Kleinhans; the appointment was scheduled for December 27th, with a recommendation that Polston return in two weeks, id. at ¶ 51. Morgan states that Polston had high blood pressure readings in January and February 2011; the FDOC provided medication, but inadequate follow-up care. Id. at 11-12, ¶ 52. Morgan also states that Dr. Kleinhans saw Polston on February 28, 2011, advised him that his magnetic resonance imaging (MRI) showed fluid collection, deformity and potential infection, and recommended a return visit in one week; Polston was not seen again until April 2, 2011. Id. at 12, ¶ 53.

According to Morgan, the following events contributing to Polston's deteriorating health and ultimate demise transpired in 2011. On March 3, 2011, a cardiologist recommended an urgent stress test because an electrocardiogram (EKG) showed Polston had suffered a previous heart attack, id. at ¶ 55; he had a high blood pressure reading on March 4th, id. at ¶ 56; Polston had a stress test on March 24th, id. at ¶ 55; he had another surgery to place hardware in his hip on April 25th, id. at ¶ 57; follow-up care in one week was recommended, but it was set for two weeks later, id.; medical personnel noted pus-like drainage from the surgical site on May 3rd, but there was no immediate notification to the surgeon, no culture taken, and no treatment for the infection, id. at ¶ 58; the surgeon saw Polston on May 16th, for a post-operative visit, at which time he determined that Polston needed another surgery to open and drain his hip, id. at ¶ 59; Polston was admitted to the hospital on June 8, 2011, id. at 13, ¶ 59; in August 2011, a specialist removed the hardware from Polston's hip and ordered a peripherally inserted central catheter (PICC) line for the delivery of antibiotics, id. at ¶ 60; by early September, medical personnel had not provided a PICC line; id. at ¶ 61; Polston grieved the issue, and medical personnel provided a PICC line on September 20th, id.; the surgeon saw Polston on October 3rd, and recommended daily dressing changes, id. at ¶ 62; the first documented dressing change was on November 1st, id.; and medical personnel referred

Polston to an infectious disease doctor on December 12, 2011, <u>id.</u> at ¶ 63.

Morgan provides the following medical chronology from January 2012 through March 10, 2014, when Polston died. On January 23, 2012, a culture of Polston's hip revealed a pseudomonas infection; <u>id.</u> at ¶ 64; an infectious disease doctor saw Polston on or about February 1st, and recommended Vancomycin, an antibiotic, on February 29th, <u>id.</u> at ¶¶ 63, 64; when Polston had a breathing hardship, blue lips and high blood pressure in March 2012, a nurse attended to him, and ultimately, sent him to the hospital by non-emergent transfer, <u>id.</u> at ¶ 65; medical personnel admitted him to the hospital,[5] where he remained until April 3, 2012, with reticulonodular lung disease and possible yeast pneumonia, <u>id.</u>; medical personnel noted that Polston had elevated blood pressure readings on June 14, 2012, and monitored him for one week, <u>id.</u> at ¶ 66; a nurse requested that a doctor examine Polston since he had elevated readings, but medical personnel did not see Polston again until July 21, 2012, <u>id.</u>; Dr. Laneva, an orthopedic specialist, prescribed Lortab on September 30, 2013, but a medication administration report shows that no Lortab was provided in October 2013, <u>id.</u> at 14, ¶ 67; on January 30, 2014, and Polston had a left

_____

[5] Morgan asserts that Polston almost lost consciousness on March 24, 2012, and was ultimately admitted to the hospital on March 4, 2012. FAC at 13, ¶ 65. It is therefore unclear <u>when</u> Polston was admitted to the hospital.

hip arthrotomy with cultures, which still revealed an infection, id. at ¶ 68. According to Morgan, after Polston's March 10, 2014 death, the Florida Department of Law Enforcement conducted an investigation. Id. at ¶ 69.

### IV. Summary of the Arguments

### A. Defendants' Motion to Dismiss

In the Motion to Dismiss, Defendants seek dismissal of counts I through VII, and X. In doing so, they assert that the Court should dismiss Morgan's: (1) ADA claim in count I against Secretary Jones, in her official capacity, because (a) "it is really a medical negligence claim that has pre-suit requirements that have not been met," Motion to Dismiss at 7, and (b) punitive damages are not available under the ADA, see id. at 7-10; (2) 42 U.S.C. § 1983 claims in counts II through VII because (a) they are based on supervisory liability, and (b) Title II of the ADA does not allow claims against state employees in their individual capacities, see id. at 10-12; and (3) count X because the Eleventh Amendment bars a claim for damages against Secretary Jones in her official capacity under § 1983, see id. at 13.

Morgan states that the factual allegations in the FAC are sufficient, and requests that the Court deny the Motion to Dismiss and direct the Defendants to answer the FAC. See Response I at 9, 18. First, as to count I, she asserts that Polston notified Defendant Jones about ADA violations and denials and delays of

medical care, and she failed to act. See id. at 10-12. Next, with respect to counts II through VII, she argues: (1) "this is not a medical care case only," id. at 13, and (2) the factual assertions show that each Defendant actively participated, reviewed, approved and/or signed off on grievances regarding Polston's issues, see id. at 13-16. As to Defendants' request to dismiss counts II through VII relating to any ADA violations against the Defendants in their individual capacities, Morgan acknowledges that she "has not pled against these individuals ADA violations, but has alleged violations under 42 USC Sec. 1983, as the Complaint clearly states." Id. at 17. Additionally, Morgan "agrees to withdraw Count X, without prejudice." Id.

## B. Defendant Gaxiola's Motion to Dismiss

Defendant Gaxiola seeks dismissal of Count VIII of the FAC. In doing so, Gaxiola asserts that the Court should dismiss her from the action because: (1) she is named in her supervisory capacity, see Gaxiola Motion at 2; (2) Morgan fails to allege facts showing a causal connection between her actions or inactions and any alleged deprivation of Polston's federal constitutional rights, see id. at 2-4; and (3) her only alleged involvement is "tied" to two grievances and her responses to those grievances, id. at 3. In response to the Motion, Morgan states that she has sufficiently pled a § 1983 claim against Gaxiola, and requests that the Court deny the Gaxiola Motion and direct Defendant Gaxiola to answer the

FAC. Response II at 15. In doing so, Morgan asserts that Polston notified Gaxiola about alleged violations, and "she actively participated, reviewed, approved and/or signed off on grievances regarding the issues presented by Mr. Polston." Id. at 10.

## V. Law and Conclusions

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law. Salvato v. Miley, 790 F.3d 1286, 1295 (11th Cir. 2015); Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (citation omitted); Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (citations omitted). Moreover, the Eleventh Circuit "'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation' in § 1983 cases." Rodriguez v. Sec'y, Dep't of Corr., 508 F.3d 611, 625 (11th Cir. 2007) (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)). In the absence of a federal constitutional deprivation or violation of a federal right, a plaintiff cannot sustain a cause of action against the defendants.

The Eleventh Circuit has explained the requirements for an Eighth Amendment violation.

> "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones . . . ." Farmer, 511 U.S. at 832, 114 S.Ct. at 1976 (internal quotation

and citation omitted).[6] Thus, in its
prohibition of "cruel and unusual
punishments," the Eighth Amendment requires
that prison officials provide humane
conditions of confinement. Id. However, as
noted above, only those conditions which
objectively amount to an "extreme deprivation"
violating contemporary standards of decency
are subject to Eighth Amendment scrutiny.
Hudson, 503 U.S. at 8-9, 112 S.Ct. at 1000.[7]
Furthermore, it is only a prison official's
subjective deliberate indifference to the
substantial risk of serious harm caused by
such conditions that gives rise to an Eighth
Amendment violation. Farmer, 511 U.S. at 828,
114 S.Ct. at 1974 (quotation and citation
omitted); Wilson, 501 U.S. at 303, 111 S.Ct.
at 2327.[8]

Thomas v. Bryant, 614 F.3d 1288, 1306-07 (11th Cir. 2010). "To show

that a prison official acted with deliberate indifference to

serious medical needs, a plaintiff must satisfy both an objective

and a subjective inquiry." Brown v. Johnson, 387 F.3d 1344, 1351

(11th Cir. 2004) (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th

Cir. 2003)). First, the plaintiff must satisfy the objective

component by showing that he had a serious medical need.  Goebert

v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir. 2007).

> "A serious medical need is considered
> 'one that has been diagnosed by a physician as
> mandating treatment or one that is so obvious
> that even a lay person would easily recognize
> the necessity for a doctor's attention.'" Id.
> (citing Hill v. Dekalb Reg'l Youth Det. Ctr.,

---

[6] Farmer v. Brennan, 511 U.S. 825 (1994).

[7] Hudson v. McMillian, 503 U.S. 1 (1992).

[8] Wilson v. Seiter, 501 U.S. 294 (1991).

> 40 F.3d 1176, 1187 (11th Cir. 1994)). In either case, "the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." <u>Id.</u> (citation and internal quotations marks omitted).

<u>Brown</u>, 387 F.3d at 1351.

Next, the plaintiff must satisfy the subjective component, which requires the plaintiff to "allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." <u>Richardson</u>, 598 F.3d at 737 (describing the three components of deliberate indifference as "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.") (citing <u>Farrow</u>, 320 F.3d at 1245); <u>Lane</u>, 2016 WL 4487983, at *4 (setting forth the three components) (citing <u>Farrow</u>, 320 F.3d at 1245).

> In <u>Estelle</u>[9], the Supreme Court established that "deliberate indifference" entails more than mere negligence. <u>Estelle</u>, 429 U.S. at 106, 97 S.Ct. 285; <u>Farmer</u>, 511 U.S. at 835, 114 S.Ct. 1970. The Supreme Court clarified the "deliberate indifference" standard in <u>Farmer</u> by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837, 114 S.Ct. 1970 (emphasis added). In interpreting <u>Farmer</u> and <u>Estelle</u>, this Court

---

[9] <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976).

explained in McElligott[10] that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott, 182 F.3d at 1255; Taylor,[11] 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

Farrow, 320 F.3d at 1245-46.

Even assuming a plaintiff's allegations suggest negligence, "[a]ccidents, mistakes, negligence, and medical malpractice are not 'constitutional violation[s] merely because the victim is a prisoner.'" Harris v. Coweta Cty., 21 F.3d 388, 393 (11th Cir. 1994) (citing Estelle, 429 U.S. at 106). Consequently, any allegedly negligent conduct of which a plaintiff complains does not rise to the level of a federal constitutional violation and provides no basis for relief in this 42 U.S.C. § 1983 action.

The United States Supreme Court has stated:

[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most[,] it is medical malpractice, and as such the proper forum is the state court . . . .

---

[10] McElligott v. Foley, 182 F.3d 1248 (11th Cir. 1999).

[11] Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000).

Estelle, 429 U.S. at 107; Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) ("[T]he question of whether [defendant] should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment."); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) ("Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the [inmate's] diagnosis or course of treatment support a claim of cruel and unusual punishment.").

## A. Count I - FDOC Secretary Julie Jones

As previously stated, Morgan sues Secretary Jones,[12] in her official capacity, for a variety of ADA violations that allegedly occurred while Polston was confined in the FDOC. See FAC at 15-17. Section 12132 of the ADA provides as follows: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under Title II of the ADA, a plaintiff must allege the following: "(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or ...

_____

[12] Governor Rick Scott appointed Julie Jones as FDOC Secretary on January 5, 2015. See http://www.dc.state.fl.us.

denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated [against] by such entity; (3) by reason of such disability." Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001) (alteration in original) (internal quotations omitted). Title II of the ADA applies to inmates confined in state correctional facilities. United States v. Georgia, 546 U.S. 151, 154 (2006) (citing Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998)); Bircoll v. Miami-Dade Cty., 480 F.3d 1072, 1081 (11th Cir. 2007) (stating "that a disabled prisoner can state a Title II ADA claim if he is denied participation in an activity provided in state prison by reason of his disability").

For purposes of her motion to dismiss, Defendant Jones does not contest that Polston was a qualified individual with a disability. See Motion to Dismiss at 7. However, she does challenge Morgan's ability to establish the second and third elements (whether Polston was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity because of his disability) of her claim. See id. at 7-8. As to these elements, Morgan asserts that this case involves: (1) the FDOC's denial of medical care, (2) Polston's access to services, programs, and activities, and (3) the FDOC's non-compliant housing and transportation services. See Response I at 12. Morgan points to the FAC at paragraphs 19, 43, 44, 49, 70-74, 82, 86, 87, 91, and 92 as instances of ADA violations. See id. at 11. Moreover, Morgan

states that Polston informed the FDOC Secretary on September 10, 2010, about problems he encountered when he was allegedly placed on a pallet on the floor. See FAC at 11, ¶ 49. The office of inmate grievance appeals responded on September 30, 2010, and advised Polston that "the institution will be providing you with a response once their review is completed." Id. (internal quotations omitted). Defendant Jones states that Morgan has failed to demonstrate that Polston was excluded from the benefits of medical and diagnostic services due to his disability and has failed to allege any discriminatory motive relating to the delivery (or lack thereof) of medical services. See Motion to Dismiss at 7-8.

    As Defendant Jones correctly points out, Morgan has not alleged sufficient facts to state a prima facie case of discrimination under the ADA with respect to claims relating to the alleged denial or delay of medical care. Morgan has neither provided facts showing a discriminatory motive in the delivery of medical services nor allegations that Polston was denied or delayed access to medical care due to his disability. Additionally, Morgan has failed to provide any facts relating to her assertion that the FDOC denied Polston access to services, programs, and activities. Thus, Defendant Jones' Motion to Dismiss is due to be granted as to Morgan's ADA claims under count I relating to the FDOC's alleged denial of access to services, programs, activities, and medical care. As to Morgan's remaining ADA claims relating to the FDOC's

alleged failure to provide compliant housing and transportation services, she has "nudged" those claims "across the line from conceivable to plausible," Twombly, 550 U.S. at 570. Therefore, the Motion to Dismiss is due to be denied as to Morgan's ADA claims under count I relating to non-compliant housing and transportation services.

Next, Defendant Jones asserts that punitive damages are not available under the ADA. See Motion to Dismiss at 9-10. The United States Supreme Court has held that punitive damages may not be awarded in actions brought under § 202 of the ADA and § 504 of the Rehabilitation Act. See Barnes v. Gorman, 536 U.S. 181, 189 (2002) (footnote omitted). Therefore, the Motion to Dismiss is due to be granted as to Morgan's request for punitive damages under the ADA in count I.

### B. Counts II-VI - 42 U.S.C. § 1983 Claims

Defendants Tucker, Riedl, Wellhausen, Davis and Kish assert that the Court should dismiss Morgan's § 1983 claims in counts II through VI because such claims are based on supervisory liability. Morgan asserts that Polston made the Defendants aware of ADA violations and medical issues through the administrative grievance procedures. She avers that Polston directly reported the FDOC's medical and ADA noncompliance when he submitted grievances, appeals and ADA complaints to Tucker (FDOC Secretary from August 2011 to December 2012), Riedl (RMC Warden), Wellhausen (CCI Warden), Davis

(RMC Warden) and Kish (Acting Warden at CCI and institutional ADA coordinator in 2011), but they failed to correct the alleged violations. See Response I at 13; see also FAC at 17-31. Morgan asserts that the Defendants were "personally involved with [Polston]'s medical care" when Polston directly notified them of his deprivations in grievances and appeals, see Response I at 13; the Defendants "actively participated" in the alleged violations when they "reviewed, approved and/or signed off on grievances regarding the issues presented by Mr. Polston," see id.; the Defendants knew that the FDOC was neither following the recommendations of medical experts nor complying with the ADA, see id. at 14; and the wardens attended and participated in departmental meetings, and therefore, would have been familiar with Polston's multitudinous grievances and appeals. See id. at 16.

As to Morgan's supervisory claims against the Defendants, the United States Court of Appeals for the Eleventh Circuit has stated:

> "Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability." Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994) (internal quotation marks and citation omitted). "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Gonzalez, 325 F.3d at 1234 (internal quotation marks and citation omitted).[13] "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection

---

[13] Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003).

between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).

"The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" Cottone, 326 F.3d at 1360 (citation omitted).[14] "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Brown, 906 F.2d at 671. A plaintiff can also establish the necessary causal connection by showing "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," Gonzalez, 325 F.3d at 1235, or that a supervisor's "custom or policy . . . resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991).

Danley v. Allen, 540 F.3d 1298, 1314 (11th Cir. 2008); see Keith v.

DeKalb Cty., Ga., 749 F.3d 1034, 1047–48 (11th Cir. 2014). In sum,

To state a claim against a supervisory defendant, the plaintiff must allege (1) the supervisor's personal involvement in the violation of his constitutional rights,[15] (2) the existence of a custom or policy that resulted in deliberate indifference to the

---

[14] Cottone v. Jenne, 326 F.3d 1352 (11th Cir. 2003).

[15] See Goebert v. Lee Cty., 510 F.3d 1312, 1327 (11th Cir. 2007) ("Causation, of course, can be shown by personal participation in the constitutional violation.") (citation omitted).

plaintiff's constitutional rights,[16] (3) facts supporting an inference that the supervisor directed the unlawful action or knowingly failed to prevent it,[17] or (4) a history of widespread abuse that put the supervisor on notice of an alleged deprivation that he then failed to correct. See id. at 1328–29 (listing factors in context of summary judgment).[18] A supervisor cannot be held liable under § 1983 for mere negligence in the training or supervision of his employees. Greason v. Kemp, 891 F.2d 829, 836–37 (11th Cir.1990).

Barr v. Gee, 437 F. App'x 865, 875 (11th Cir. 2011) (per curiam).

Morgan's facts, as set forth in the FAC, show that orthopedic surgeon(s) and infectious disease specialist(s) attended to Polston's medical needs after his December 4, 2009 fall.[19] Nevertheless, as to Defendants Tucker, Riedl, Wellhausen, Davis and Kish, Morgan provides facts suggesting that these Defendants

---

[16] See Goebert, 510 F.3d at 1332 ("Our decisions establish that supervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations.").

[17] See Douglas v. Yates, 535 F.3d 1316, 1322 (11th Cir. 2008) ("Douglas's complaint alleges that his family informed Yates [(an Assistant Warden)] of ongoing misconduct by Yates's subordinates and Yates failed to stop the misconduct. These allegations allow a reasonable inference that Yates knew that the subordinates would continue to engage in unconstitutional misconduct but failed to stop them from doing so.").

[18] West v. Tillman, 496 F.3d 1321 (11th Cir. 2007).

[19] According to Morgan, Polston underwent six hip surgeries to repair his December 2009 hip fracture, clean the allegedly infectious wound site, and insert/remove hardware in his hip: December 11, 2009; July 22, 2010; August 2010; April 25, 2011; August 2011; and January 30, 2014. See FAC at 7, 9, 10, 12, 13, 14.

personally participated in alleged violations of Polston's federal constitutional rights when Polston grieved about FDOC medical deprivations and ADA noncompliance and the Defendants failed to take corrective action to remedy the alleged unlawful acts of their subordinates. See Goebert, 510 F.3d at 1326-29. Thus, because Morgan provides sufficient facts to plausibly allege that the Defendants were personally involved in, or otherwise causally connected to, the alleged violations of Polston's federal constitutional right under § 1983, the Motion to Dismiss is due to be denied with respect to Morgan's § 1983 claims in counts II through VI against Defendants Tucker, Riedl, Wellhausen, Davis and Kish.

### C. Counts II-VII - ADA Claims

The Defendants request that the Court dismiss counts II through VII as to any ADA claims against the Defendants in their individual capacities. See Motion to Dismiss at 12. Morgan concedes that she has not asserted any ADA claims against the individual Defendants. See Response I at 17. The ADA and the Rehabilitation Act do not provide for individual liability, and only public entities may be liable under these statutes. See Morgan v. Christensen, 582 F. App'x 806, 809 (11th Cir. 2014); Badillo v. Thorpe, 158 F. App'x 208, 211 (11th Cir. 2005) (citation omitted). Therefore, Morgan's claims under the ADA against Defendants Tucker,

Riedl, Wellhausen, Davis, Kish and Morales in counts II through VII are due to be dismissed.

### D. Counts VII and VIII
### Defendants Morales and Gaxiola

Defendants Morales and Gaxiola seek the dismissal of counts VII and VIII. See Motion to Dismiss at 10-12; Gaxiola Motion at 2-4. In doing so, they assert that the Court should dismiss the counts against them because: (1) they are named in their supervisory capacities; (2) Morgan fails to allege facts showing a causal connection between their actions or inactions and any alleged deprivation of Polston's federal constitutional rights; (3) their only alleged involvement was that they denied Polston's grievances; and (4) Morgan "fails to allege that [Drs. Morales and Gaxiola] actually treated Polston or denied Polston necessary medical care." Motion to Dismiss at 12; Gaxiola Motion at 4. In response to the motions, Morgan states that she has sufficiently pled § 1983 claims against them, and requests that the Court deny the motions and direct them to answer the FAC. In doing so, she asserts that Polston notified the Defendants about alleged violations, and the Defendants actively participated, reviewed, approved and/or signed off on grievances regarding the issues presented by Mr. Polston.

In their capacities at Chief Health Officers, Drs. Morales and Gaxiola were responsible for Polston's medical care and "oversight and fulfillment of that care." See FAC at 31, 33. Morgan asserts

that the Defendants denied Polston prescribed medications and pain management and therapy that other physicians had recommended. <u>See</u> <u>id.</u> She holds them responsible for the alleged denial and delay of medical care because they were responsible for overseeing Polston's treatment regimen. The parties may disagree as to the extent of Drs. Morales and Gaxiola's authority and involvement relating to Polston's medical care. However, this case presents itself to the Court in the context of motions to dismiss, and therefore the Court accepts the facts as alleged in the FAC as true. <u>See</u> <u>Kothmann v.</u> <u>Rosario</u>, 558 F. App'x 907, 908 n.1 (11th Cir. 2014). Upon review of Morgan's assertions relating to Defendants Morales and Gaxiola, <u>see</u> FAC at 31-33, 33-34, the allegations are sufficient to state a facially plausible Eighth Amendment claim. Therefore, Defendant Morales' Motion to Dismiss and Gaxiola's Motion are due to be denied as to Morgan's § 1983 claims against them in counts VII and VIII.

### E. Count X - FDOC Secretary Jones

Defendant Jones asserts that the Court should dismiss count X because the Eleventh Amendment bars a § 1983 claim for damages against her in her official capacity. <u>See</u> Motion to Dismiss at 13. Morgan agrees to withdraw Count X without prejudice. <u>See</u> Response I at 17. For this reason, the Court will grant Morgan's request to dismiss the claim without prejudice. Therefore, Defendant Jones' request to dismiss count X is due to be denied as moot.

Accordingly, it is now

**ORDERED**:

1.   Defendants Jones, Tucker, Riedl, Wellhausen, Davis, Kish and Morales' Motion to Dismiss Fourth Amended Complaint (Doc. 131) is **GRANTED** as to Morgan's: (1) ADA claims against Defendant Jones in count I relating to the FDOC's denial of access to services, programs, activities, and medical care; (2) request for punitive damages under the ADA in count I; and (3) ADA claims against Defendants Tucker, Riedl, Wellhausen, Davis, Kish and Morales in counts II through VII. The Motion to Dismiss is **DENIED** as to Morgan's: (1) ADA claims against Defendant Jones in count I relating to non-compliant housing and transportation services, and (2) 42 U.S.C. § 1983 claims against Defendants Tucker, Riedl, Wellhausen, Davis, Kish and Morales in counts II through VII.

2.   The Motion to Dismiss (Doc. 131) as to Defendant Jones' request to dismiss count X is **DENIED** as moot.

3.   Morgan's request to withdraw count X without prejudice is **GRANTED**, and count X is **DISMISSED without prejudice.**

4.   Defendant Gaxiola's Motion to Dismiss Fourth Amended Complaint (Doc. 148) is **DENIED.**

5. The Defendants shall answer or otherwise respond to the remaining counts in the Fourth Amended Complaint **no later than October 19, 2016**.

**DONE AND ORDERED** at Jacksonville, Florida, this 13th day of September, 2016.

MARCIA MORALES HOWARD
United States District Judge

sc 9/12
c:
Counsel of Record